**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **VICTORIA RICHARDSON,**<br><br>    Plaintiff,<br><br>v.<br><br>**JÜRGENS MASCHINENBAU GMBH & CO. KG,**<br><br>    Defendant. | C/A No.:  2:26-cv-3346-RMG<br><br><br>**COMPLAINT**<br><br>(Jury Trial Demanded) |

Plaintiff Victoria Richardson alleges as follows:

### INTRODUCTION

1.      This is a products-liability action arising out of a catastrophic machine-entrapment injury caused by a Jürgens Winder W 260 in use at the Albany International Corp. facility in St. Stephen, South Carolina. On August 21, 2025, Plaintiff Victoria Richardson, a weaver/base-generations operator, was performing the routine and foreseeable task of taping and smoothing a completed stock roll on the winder associated with the "12.4" Jürgens loom when the winder's driven rollers, running in the reverse/opposite direction, drew both of her arms into an exposed in-running nip point at the operator side of the machine.

2.      The Winder W 260 is equipped with a direction-of-rotation control that allows the driven rollers to be placed in reverse. In normal forward winding, the rollers rotate outward at the operator side and present no in-running nip point there. In reverse, however, the same rollers create an exposed, unguarded in-running nip point at the front of the machine—at approximately chest height, without any cage, barrier, set-back, or presence-sensing device—into which an operator's or bystander's hand or arm can be drawn.

3.      Reverse operation is a designed and intended function of the winder, and it must be used to take up slack, tension the fabric, and tape and secure a completed roll so that the fabric does not unwind when the roll is later lifted and moved. To place the machine in reverse, the operator activates the direction control and then leaves the control station to work at the roll, so that no one remains at the controls while the hazardous motion stays energized and accessible.

4.      Jürgens knew or should have known that the winder could create a crushing and entrapment hazard at the driven rollers. Its own operating materials identify a crushing risk at the driven rollers, identify the direction-of-rotation selection switch, and identify a safety-cable ("belly-wire") pull system—yet those same materials minimize the hazard as "very small" due to low speed, represent that fingers "cannot be pulled into the winder" and that the hazard is "only possible from the rear," and provide no safe procedure for taping or securing a completed roll. Despite recognizing the hazard, Jürgens failed to provide reasonable, feasible safeguards, including a momentary/hold-to-run/two-hand reverse control requiring an operator to remain at the controls, an interlocked barrier or presence-sensing device, end guards, a safe tool for applying tape, a readily accessible mushroom-style emergency stop, a properly tensioned and adjusted safety cable, and adequate warnings and instructions.

5.      As a direct and proximate result, Ms. Richardson suffered severe crushing injuries to both arms, including compartment syndrome requiring immediate surgery to avoid amputation, multiple additional surgeries, a right wrist contracted in flexion, tendon adaptive shortening, painful hypertrophic scarring, median-nerve numbness and tingling, complex regional pain syndrome, and permanent loss of use and function.

**PARTIES AND JURISDICTION**

6.      Plaintiff Victoria Richardson is a citizen and resident of South Carolina.

2

7.     Upon information and belief, Defendant Jürgens Maschinenbau GmbH & Co. KG is a German company with a principal address of Lönsstraße 15, D-48282 Emsdetten, Germany. Upon information and belief, Jürgens designed, manufactured, sold, distributed, installed, serviced, provided instructions for, and/or continues to service the Winder W 260 at issue in this case. Jürgens may be served through applicable international service procedures, including the Hague Service Convention, and/or by any other method authorized by law.

8.     Plaintiff and Defendant are citizens or subjects of different states or foreign states, and Defendant is not a citizen of South Carolina.

9.     The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332.

11.     This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant purposefully placed the subject Winder W 260 into the stream of commerce with the knowledge and expectation that it would be installed, operated, serviced, and used in South Carolina; contracted for or facilitated delivery, installation, instruction, and/or ongoing service of industrial machinery in South Carolina; and derived substantial revenue from goods used in South Carolina.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in the District of South Carolina, including the installation, operation, and injury-causing use of the subject winder in St. Stephen, South Carolina.

## FACTUAL ALLEGATIONS

13.     At all relevant times, Jürgens was in the business of designing, manufacturing, marketing, distributing, selling, installing, servicing, and/or providing operating instructions for

3

industrial weaving and winding machinery, including the Winder W 260.

14. The subject machine is a Jürgens Winder W 260 associated with the "12.4" flat-weaving Jürgens loom at Albany International Corp.'s St. Stephen, South Carolina facility, where it is used to wind woven felt onto a large beam or stock roll.

15. The winder uses two lower driven, rubber-coated rollers to rotate a product roll that rests on and is driven by those rollers through friction. As the product roll builds in diameter, a take-up arrangement rises to keep the roll seated on the driven rollers.

16. The winder includes a control station with a direction-of-rotation selection switch. In normal forward winding, viewed from the operator side, the rollers rotate outward and do not create an in-running nip point on that side; under normal operation, any in-running nip point exists only at the rear, where the fabric is present.

17. When the direction control is placed in reverse/opposite operation, the driven rollers reverse and create an exposed in-running nip point at the front/operator side of the winder that can draw in a hand or arm. This reverse-mode nip point is unguarded, sits at approximately chest height, and is accessible not only to the operator but to any person who approaches the machine while it runs in reverse.

18. Reverse operation is required to complete a finished roll. Operators must run the winder in reverse to take up slack, tension the fabric, and apply and smooth tape so that the completed roll does not unwind when it is later lifted by crane and transported. The tape secures the end of the roll, and any identification label, against unwinding.

19. Because the operator must place the machine in reverse and then move to the roll to apply and smooth the tape, the winder as designed permits—and effectively requires—the

4

operator to energize the reverse-mode nip point and then leave the control station, with no one remaining at the controls in a position to stop the motion.

20.     Jürgens knew or should have known that operators and other foreseeable users would work at and near the stock roll and driven rollers during setup, winding, completion, taping, smoothing, securing, labeling, cleaning, troubleshooting, and related tasks, and that a completed roll would need to be secured against unwinding before it was lifted and moved.

21.     On August 21, 2025, Ms. Richardson was completing the final steps on a finished woven stock roll, including taping the roll to secure the fabric and applying an identification label. Consistent with how she had been trained and how the task was performed at the facility, the roll was taped while still on the winder.

22.     During that process, the winder was running in reverse/opposite direction, creating the in-running nip point at the front/operator side. Ms. Richardson was smoothing and patting down tape by hand when the tape and fabric drew her hand into the nip point; her other hand and arm were drawn in as well as she tried to free herself.

23.     Both of Ms. Richardson's arms were pulled through the driven rollers and pinned beneath the product roll, which, loaded with heavy felt, weighed thousands of pounds.

24.     Ms. Richardson could not stop the machine. She could not reach or effectively activate the safety cable once both arms were captured, and there was no readily accessible mushroom-style emergency stop at the operator position.

25.     A co-worker had to run to the machine, attempt to reverse it, and then activate the stop after Ms. Richardson called for help. Multiple employees, and ultimately an improvised pry and lift, were required to free Ms. Richardson's arms from beneath the load; she was entrapped for an extended period.

26.     Emergency medical services transported Ms. Richardson to a trauma center, where she underwent immediate surgery.

27.     Ms. Richardson suffered crushing injuries to both arms, with her right arm most severely affected. Her injuries include compartment syndrome requiring immediate surgical intervention to avoid amputation; multiple additional surgeries; significant right upper-extremity range-of-motion impairment at the shoulder, elbow, wrist, and fingers; a right wrist contracted in flexion that places her at a mechanical disadvantage for functional finger use; tendon adaptive shortening in the flexors; painful, hypersensitive hypertrophic scarring on the volar forearm; median-nerve involvement with numbness and tingling; complex regional pain syndrome; emerging symptoms in the left arm; and loss of ordinary use and function.

28.     The subject winder was defective and unreasonably dangerous because it allowed reverse/opposite operation to create an exposed, unguarded in-running nip point at the operator side of the machine while permitting the operator to leave the controls and place her hands at the roll.

29.     A safe and feasible design, available when the winder was designed, manufactured, sold, installed, and placed in service, was a momentary, hold-to-run, spring-return, and/or two-hand reverse control—a control that energizes reverse motion only while a person keeps two hands (or a two-position control) depressed at the control station, and that removes power from the reverse motion the instant the control is released. Such a control forces a person to remain at the controls, away from the nip point, whenever reverse motion is energized, and stops the motion long before an entrapment can progress. Because reverse is engaged only for brief periods, a momentary two-hand control is well suited to the task.

30. The winder was defective and unreasonably dangerous because it lacked such a momentary, hold-to-run, spring-return, and/or two-hand reverse control, and instead allowed an operator to select reverse and walk away while the hazardous motion remained energized and the nip point remained exposed.

31. The winder was defective and unreasonably dangerous because it failed to guard the reverse-mode nip point by any feasible means. Feasible guarding included a presence-sensing device or light curtain that stops the winder when a person approaches the hazard; an interlocked barrier or cage that de-energizes reverse operation when the hazard zone is entered or a guard door is opened; and/or fixed end guards preventing access to the rollers from the ends and rear of the machine. A reasonable design also guards by distance—forcing the operator away from the hazard while the machine runs in reverse, which the momentary/two-hand control accomplishes. Here, the winder used none of these approaches.

32. The winder was defective and unreasonably dangerous because Jürgens failed to provide a safe method and tooling for the foreseeable task of applying and smoothing tape on a completed roll—such as a hand tool, wand, or applicator that keeps the user's hands away from the moving rollers—and failed to provide any procedure for that task.

33. The winder was defective and unreasonably dangerous because its safety-cable ("belly-wire") system was inadequate to protect an operator whose arms became entrapped. It required several inches of travel or deflection before it would stop the machine, was not properly tensioned or adjusted, and was not positioned so that an entrapped operator could reliably activate it with her body or elbow.

34. The winder was defective and unreasonably dangerous because the control station lacked a readily accessible, conspicuous mushroom-style emergency-stop device at the operator

7

position. Any stop function was not a standard palm/mushroom emergency stop and/or was located remotely on the machine, where an operator working at the roll could not reach it.

35.     The winder was defective and unreasonably dangerous because its warnings, labels, and instructions failed to adequately identify or protect against the reverse-mode nip-point hazard. Its materials affirmatively minimized the hazard as a "very small" risk due to low speed, represented that fingers "cannot be pulled into the winder" and that the hazard was "only possible from the rear," and did not warn that selecting reverse moves the nip point to the operator side and exposes it. Nor did they provide any safe procedure for taping, smoothing, labeling, or securing a completed roll.

36.     Jürgens failed to perform an adequate hazard analysis for reverse/opposite operation of the winder. A reasonable hazard analysis would have recognized that a design allowing an operator to energize reverse and then walk up and place a hand into an unguarded nip point creates a foreseeable crushing and entrapment hazard requiring elimination or guarding.

37.     Feasible alternative designs and safeguards were available at the time the winder was designed, manufactured, sold, installed, and placed into service, including but not limited to:

    a.     a momentary, spring-return, hold-to-run, and/or two-hand reverse control that stops reverse motion when released;

    b.     presence-sensing devices, light curtains, or scanners that stop the winder when a person approaches the hazard during reverse operation;

    c.     an interlocked barrier or cage that de-energizes reverse operation when the hazard zone is entered or a guard door is opened;

    d.     fixed end guards preventing access to the rollers from the ends and rear of the machine;

8

e.      a properly positioned, tensioned, and adjusted safety cable capable of activation by an entrapped operator, including redundant cables at multiple heights;

f.      a conspicuous mushroom-style emergency stop at the operator/control station;

g.      safe tools or applicators for applying and smoothing tape without placing hands near the moving rollers; and

h.      adequate warnings, instructions, and a safe written procedure for any reverse, taping, or roll-securing operation.

38.     After the incident, the employer modified the winder's reverse activation so that the control must be held in order to run the machine in reverse, demonstrating the technical and economic feasibility of a hold-to-run design.

39.     Had Jürgens incorporated any of these reasonable alternative designs and provided adequate warnings and instructions, Ms. Richardson would not have been drawn into the winder and would not have suffered the injuries and damages described herein.

## CAUSES OF ACTION

### Count One: Strict products liability

40.     Plaintiff incorporates all prior paragraphs as if fully set forth herein.

41.     Defendant is a seller of the subject Winder W 260 within the meaning of S.C. Code Ann. § 15-73-10 et seq.

42.     Defendant sold the subject Winder W 260 in a defective condition unreasonably dangerous to foreseeable users, including Ms. Richardson.

43.     At the time of the incident, the subject winder was being used in a manner that was intended, foreseeable, and reasonably anticipated by Defendant, and the injury-producing hazards

9

existed when the machine left Defendant's control and/or when Defendant installed, instructed, serviced, or approved the machine for use.

44.     The subject winder was defective in design, warnings, instructions, and safety controls in the following respects, among others:

a.     it allowed reverse/opposite operation to create an exposed in-running nip point at the operator side of the machine;

b.     it lacked a momentary, hold-to-run, spring-return, and/or two-hand reverse control and allowed an operator to energize reverse and leave the controls while the hazardous motion remained energized;

c.     it lacked presence-sensing devices, light curtains, interlocked barriers or cages, and/or end guarding for the reverse-mode nip point;

d.     its safety cable was inadequate in tension, adjustment, travel/deflection, positioning, and redundancy, and could not be activated by an entrapped operator;

e.     it lacked a readily accessible mushroom-style emergency stop at the operator/control station;

f.     it failed to provide a safe tool and procedure for taping, smoothing, labeling, or securing a completed stock roll;

g.     its warnings and instructions failed to identify and adequately protect against the reverse-mode nip-point hazard and affirmatively minimized it; and

h.     any other design, warning, instruction, manufacturing, installation, service, or safety defect revealed through discovery.

45. At the time the product was sold, installed, and placed into service, feasible alternative designs and warnings existed that would have eliminated or substantially reduced the unreasonable danger associated with the subject winder.

46. The defective and unreasonably dangerous condition of the subject winder was a direct and proximate cause of Ms. Richardson's injuries and damages.

**Count Two: Negligence, gross negligence, recklessness, willfulness, and wantonness**

47. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

48. Defendant owed foreseeable users, including Ms. Richardson, a duty to exercise reasonable care in the design, manufacture, testing, hazard analysis, guarding, warnings, instructions, sale, installation, service, and support of the Winder W 260.

49. Defendant breached its duties and was negligent, grossly negligent, reckless, willful, and wanton in the following respects, among others:

a. failing to conduct an adequate hazard analysis for reverse/opposite operation of the winder;

b. failing to recognize and guard the in-running nip point created during reverse/opposite operation;

c. designing and selling a machine that permitted hazardous reverse operation without an adequate hold-to-run or two-hand control;

d. failing to provide feasible guarding, including presence-sensing devices, light curtains, interlocked barriers or cages, and/or end guards;

e. failing to provide a properly tensioned, adjusted, and positioned safety cable capable of activation by an entrapped operator;

11

f.    failing to provide a conspicuous mushroom-style emergency stop at the operator/control station;

g.    failing to provide a safe tool and written procedure for taping, smoothing, labeling, and securing a completed stock roll;

h.    failing to adequately warn and instruct operators and employers regarding the reverse-mode nip-point hazard, and instead affirmatively minimizing the hazard as "very small" and "only possible from the rear;"

i.    failing to retrofit, recall, warn, or otherwise correct known hazards associated with the machine;

j.    failing to comply with applicable machine-safety principles, standards, customs, and practices;

k.    placing production and convenience over operator safety; and

l.    being otherwise negligent, grossly negligent, reckless, willful, and wanton as revealed through discovery.

50.    Defendant knew or should have known that failing to incorporate these safeguards and warnings would expose operators to a substantial risk of catastrophic crushing injuries.

51.    As a direct and proximate result of Defendant's negligence, gross negligence, recklessness, willfulness, and wantonness, Ms. Richardson suffered the injuries and damages described herein.

### Count Three: Breach of implied warranty of merchantability

52.    Plaintiff incorporates all prior paragraphs as if fully set forth herein.

53.    Defendant impliedly warranted that the subject Winder W 260 was merchantable, properly designed and manufactured, reasonably fit for the ordinary purposes for which such

12

winders are used, and safe for foreseeable users when used in an intended or reasonably foreseeable manner.

54.     The subject winder was not merchantable and was not reasonably fit for its ordinary and foreseeable purposes because it was defective and unreasonably dangerous in the respects described above.

55.     Defendant breached the implied warranty of merchantability by selling, installing, servicing, and/or placing into service a winder that exposed foreseeable users to an unguarded reverse-mode nip-point hazard without adequate controls, guarding, warnings, instructions, or emergency-stop protection.

56.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Ms. Richardson suffered severe injuries and recoverable damages.

### Count Four: Breach of implied warranty of fitness for a particular purpose

57.     Plaintiff incorporates all prior paragraphs as if fully set forth herein.

58.     Upon information and belief, Defendant knew or had reason to know the particular purposes for which the Winder W 260 was required, including winding, reverse operation, and completing, securing, and handling finished rolls in an industrial weaving facility.

59.     Upon information and belief, the purchaser, installer, employer, and foreseeable users relied on Defendant's skill and judgment to furnish a machine suitable and safe for those particular purposes.

60.     The subject winder was not fit for those purposes because it created an exposed in-running nip point during reverse/opposite operation and lacked adequate safety controls, guarding, warnings, instructions, and emergency-stop systems.

61.    As a direct and proximate result of Defendant's breach of the implied warranty of fitness for a particular purpose, Ms. Richardson suffered severe injuries and recoverable damages.

### Causation and damages

62.    Plaintiff incorporates all prior paragraphs as if fully set forth herein.

63.    As a direct and proximate result of Defendant's conduct, defects, breaches, and omissions, Ms. Richardson suffered severe and catastrophic injuries to both arms, including injuries requiring emergency medical treatment and multiple surgeries.

64.    Ms. Richardson has suffered and will continue to suffer past and future physical pain, mental anguish, emotional distress, permanent impairment, disability, scarring, disfigurement, loss of use, loss of function, loss of enjoyment of life, inconvenience, and other non-economic harms.

65.    Ms. Richardson has incurred and will continue to incur medical expenses, therapy expenses, rehabilitation expenses, future medical-care costs, lost wages, loss of earning capacity, and other recoverable economic losses.

66.    Defendant's conduct was reckless, willful, wanton, and in conscious disregard for the rights and safety of foreseeable users. Punitive damages should be assessed against Defendant in an amount sufficient to punish and deter similar conduct.

### RELIEF REQUESTED

WHEREFORE, Plaintiff Victoria Richardson prays for judgment against Defendant as follows:

A.    For actual and compensatory damages according to proof;

B.    For punitive damages as determined by the trier of fact;

C.    For pre-judgment and post-judgment interest as permitted by law;

14

D.      For costs and expenses as permitted by law;

E.      For a trial by jury on all issues so triable; and

F.      For such other and further relief as this Court deems just and proper.


Respectfully submitted,

**RICHARDSON THOMAS, LLC**

By: s/ Brady R. Thomas
   Brady R. Thomas (Fed. ID No. 9623)
   brady@richardsonthomas.com
   William C. Lewis (Fed. ID No. 12076)
   will@richardsonthomas.com
   1513 Hampton Street
   Columbia, South Carolina 29201
   T: (803) 281-8150

**PRICE LAW GROUP, LLC**
   Bentley D. Price (Fed. ID No. 9374)
   bentley@pricelawgroupsc.com
   P.O. Box 20068
   Charleston, SC 29413
   T: (843) 513-6253

   ***ATTORNEYS FOR PLAINTIFF***

Dated: August 7, 2026

Columbia, South Carolina